ANDERSON BROTHERS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61238. Filed May 16, 1960.

*Clyde L. Wilson, Jr., Esq.,* for the petitioner.
*Robert L. Liken, Esq.,* for the respondent.

OPINION.

OPPER, *Judge:* Respondent determined a deficiency in income and excess profits tax for petitioner's year ended June 30, 1951, in the amount of $49,685.88. The sole issue is whether a balance carried on petitioner's books in an account entitled "Work in Progress" is properly included in petitioner's total assets at June 30, 1950, for purposes of computing its excess profits credit.

All of the facts, having been stipulated, are hereby found accordingly. They are, in part, as follows:

Petitioner, a corporation organized under the laws of Texas on July 1, 1946, had its principal place of business during its fiscal years ended June 30, 1950, 1951, and 1952 in Houston, Texas, and filed its income tax returns for those years with the collector (director) of internal revenue, Austin, Texas.

During the fiscal years ended June 30, 1950, June 30, 1951, and June 30, 1952, Petitioner's primary business activity was that of a pipe line contractor. It maintained its books and filed its United States income and excess profits tax returns for such fiscal years and prior years on the completed contract basis.

In the construction of pipe lines during the fiscal years ended June 30, 1950, June 30, 1951, and June 30, 1952, the pipe line customers provided the rights of way and furnished the pipe. Petitioner furnished labor, equipment, and other materials and supplies. The customary contract entered into by Petitioner and its customers during these fiscal years provided for a contract price which was based upon specified unit prices for the various phases or classes of work to be performed by the Petitioner pursuant to the contract. The customary contract provided further that either monthly or semi-monthly, Petitioner would be paid a fixed percentage, usually 80 per cent or 90 per cent, of the estimated amount payable for work done by Petitioner during the preceding period as a partial payment on the total contract price, the remaining 10 per cent or 20 per cent being payable by the customer after the completion of the contract upon its final acceptance of the work performed by Petitioner.

In accounting for pipe line construction contracts in progress during the

fiscal years ended June 30, 1950, June 30, 1951, and June 30, 1952, and all prior years, Petitioner accumulated all costs with respect to a particular contract in an asset account styled "Work in Progress" until the job was completed. All amounts billed the customer prior to completion of the contract were credited on the books of Petitioner to a deferred income account styled "Deferred Income—Job Contracts", and accounts receivable were debited. When payments were received, the accounts receivable were credited and the cash account was debited. Upon completion of the job and the acceptance by the customer, the charges in the "Work in Progress" account and the credits in the "Deferred Income—Job Contracts" account with respect to the job were transferred to profit and loss. At the end of the fiscal years ended June 30, 1950, June 30, 1951, and June 30, 1952, the books of Petitioner reflected balances in the "Work in Progress" account of $4,289,740.13, $6,778,401.57, and $10,659,490.26, respectively, and balances in the "Deferred Income—Job Contracts" account of $4,903,512.31, $8,394,242.18, and $12,447,241.16, respectively.

Attached to the return filed by petitioner on October 16, 1950, for the fiscal year beginning July 1, 1949, and ending June 30, 1950, was a comparative consolidated balance sheet which is, in pertinent part, as follows:

ASSETS

| | | June 30, 1950 |
|---|---|---|
| Cash on hand and in banks | | $22, 238. 71 |
| Net receivables | | 1, 677, 217. 69 |
| Inventory of repair parts | | 82, 396. 71 |
| Prepaid insurance | | 5, 729. 20 |
| Construction equipment | $2, 362, 424. 39 | |
| Shop machinery | 13, 169. 37 | |
| Furniture and fixtures | 28, 969. 92 | |
| Tower furnishings | 2, 391. 69 | |
| Real estate and buildings | 188, 645. 83 | |
| Total | 2, 595, 601. 20 | |
| Less: reserves for depreciation | 1, 390, 083. 68 | 1, 205, 517. 52 |
| Deposits | | 5, 767. 00 |
| Carl C. Anderson | | 29, 249. 78 |
| | | 3, 028, 116. 61 |

| LIABILITIES AND CAPITAL | June 30, 1950 |
|---|---|
| Accounts and vouchers payable | $926, 353. 84 |
| Overdraft—Bank | 703, 720. 55 |
| Notes payable | 30, 815. 00 |
| Bonuses payable | 10, 000. 00 |
| Accrued payroll taxes | 73, 240. 95 |
| Income tax withheld | 123, 443. 84 |
| Provision for Federal income tax | 101, 137. 77 |
| Deferred income from job contracts | 613, 772. 18 |
| Capital stock | 10, 000. 00 |
| Paid-in surplus | 67, 147. 11 |
| Earned surplus | 368, 476. 17 |
| Other items | 9. 20 |
| | 3, 028, 116. 61 |

A comparison of the balance sheets filed by petitioner with its return for the fiscal year ended June 30, 1950, with the balance sheet filed with its return for the fiscal year ended June 30, 1951, discloses, in pertinent part, the same total assets at June 30, 1950, save for the following:

(a) In the balance sheet attached to petitioner's return for the fiscal year ended June 30, 1951, total assets are shown in the amount of $7,317,856.74, rather than $3,028,116.61 as shown on the balance sheet included with petitioner's return for the fiscal year ended June 30, 1950.

(b) This increase in total assets in the amount of $4,289,740.13 is due entirely to the addition of an item entitled "Advance Costs on Work-in-Progress" in like amount.

A comparison of the balance sheets filed by petitioner with its returns for the fiscal years ended June 30, 1950, and June 30, 1951, each purporting to show petitioner's financial condition at June 30, 1950, discloses identical items and amounts on the liabilities and capital side of the respective balance sheets, save for the following:

(a) On the balance sheet attached to petitioner's return for the fiscal year ended June 30, 1950, appears an item entitled "Deferred Income From Job Contracts" in the amount of $613,772.18. However, on the balance sheet attached to petitioner's return for the fiscal year ended June 30, 1951, the item entitled "Deferred Income From Job Contracts" has been deleted and a new item, entitled "Reserve for Advance Billings on Work-in-Progress" has been added in the amount of $4,903,512.31 at June 30, 1950.

(b) The amount of $613,772.18 is the difference between $4,903,-512.31, shown as "Reserve for Advance Billings on Work-in-Progress," and $4,289,740.13, listed as the amount of "Advance Costs on Work-in-Progress."

A balance sheet filed by petitioner with its return for the fiscal year ended June 30, 1950, showing the various assets, liabilities, and capital of petitioner at the end of the fiscal year ended June 30, 1949, contains an item entitled "Deferred Income From Job Contracts" but does not contain items entitled "Advance Costs on Work-in-Progress" or "Reserve for Advance Billings on Work-in-Progress." "All assets held by Petitioner were held in good faith for purposes of its business."

The question presented, which is said to be of first impression, involves an interpretation of the 1950 (Korean war) Excess Profits Tax Act with respect to the computation of petitioner's excess profits credit based upon income. Not all of the steps involved are described by the parties, but as we reconstruct them, they are as follows.

Petitioner is concededly a "new corporation" as defined by section 445(a), I.R.C. 1939.[1] As such it is entitled to compute its average base period net income "[b]y multiplying the amount of [its] * * * total assets for such taxable year (determined under subsection (c)) * * * by the base period rate of return, proclaimed by the Secretary * * * for the taxpayer's industry classification."[2] The determination under subsection (c) of the total assets is made by adding to the net capital addition for such taxable year "the total assets (as defined in section 442(f)) for the last day of the taxpayer's taxable year" preceding its first excess profits taxable year. The net capital reduction is then subtracted. Finally, in arriving at the income so computed under section 445(b), there is deducted under section 445(b)(1)(B) the interest paid or incurred by the taxpayer for the 12 months ending with such taxable year.

Section 442(f), which is looked to for the definition of total assets, is set forth in the margin.[3]

The present controversy involves the correct amount of the total assets which petitioner is entitled to employ as the multiplicand for purposes of determining its excess profits credit based on income. Specifically, the problem has to do only with uncompleted contracts in the performance of which petitioner had made considerable expenditures and had received as periodic contract payments even greater sums from its customers. Petitioner contends that the total amounts paid out for performance of the contracts constitute an asset undiminished by any payments on account received from cus-

---

[1] All sections referred to are those of the 1939 Code which were added as such by the 1950 Act and subsequently amended to some extent with retroactive effect by the Revenue Act of 1951.

[2] SEC. 445. AVERAGE BASE PERIOD NET INCOME—NEW CORPORATION.

(b) AVERAGE BASE PERIOD NET INCOME.—The average base period net income of a new corporation determined under this section shall be computed as follows:

(1) For the purpose of determining the excess profits credit for any of the taxpayer's first three taxable years which is a taxable year under this subchapter—

(A) By multiplying the amount of the total assets for such taxable year (determined under subsection (c)), held by the taxpayer in good faith for the purposes of the business, by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry classification.

(B) By subtracting from the amount ascertained under subparagraph (A) the total interest paid or incurred by the taxpayer for the 12 months ending with the last day of such taxable year.

[3] SEC. 442. AVERAGE BASE PERIOD NET INCOME—ABNORMALITIES DURING BASE PERIOD.

(f) TOTAL ASSETS.—For the purposes of this section, the taxpayer's total assets for any day shall be determined as of the end of such day and shall be an amount equal to the excess of—

(1) the sum of the cash and the property (other than cash, inadmissible assets, and loans to members of a controlled group as defined in section 435(f)(4)) held by the taxpayer in good faith for the purposes of the business, over

(2) the amount of any indebtedness (other than borrowed capital as defined in section 439(b)(1)) to a member of a controlled group (as defined in section 435(g)(6)) which includes the taxpayer.

Such property shall be included in an amount equal to its adjusted basis for determining gain upon sale or exchange, determined under the rules provided in section 441.

tomers. Respondent, on the other hand, insists that under the statute and accepted accounting principles only the net amount of excess work performed, over customers' payments received, can be treated as an asset and that as the facts are constituted in the present instance, since there is no excess of expenses over payments, the item is not an asset to any extent but is, in fact, a *pro tanto* liability.

Rather than treating the present problem as primarily one of accounting practice,[4] it seems to us our obligation is to attempt to ascertain what meaning Congress intended to attribute to the relevant sections as applied to the facts which we have here. We note in this connection petitioner's explanation of the practice of intermediate payments, on account, by customers before work is completed. It is, according to petitioner, a method by which the completion of the contract can be financed without funds borrowed for that purpose.[5] This means, of course, the elimination of the offset to excess profits credit envisioned by section 445(b)(1)(B), consisting of interest, which is presumably intended to measure the effect of borrowed capital on petitioner's income.

It may be well to initiate the discussion by statements as to which apparently both parties agree: "Petitioner admits that a payment received from a customer represents a reduction of an account receivable; * * * Petitioner emphasizes that the account receivable which is reduced by such payment arose from the *billing* made to the customer by Petitioner under the terms of the contract." (Petitioner's brief.) On the other hand, "[t]here is no question but what costs of work in progress, to the extent they exceed related billings, constitute an asset. * * * When a payment is made, the account receivable is reduced to that extent." (Respondent's reply brief.)

---

[4] This does not mean that there is anything in the accounting authorities cited to us by petitioner which conflicts to any degree with the conclusion we reach. Quite the contrary. E.g.:

"The billing for the completed work would be so recorded as to bring into the books under receivables only the amount matured as a cause of action, although the deferred portion of the completed work may be recognized as a noncurrent item, as follows:

| | |
|---|---|
| Accounts receivable | $45,000 |
| Deferred portion of current billings | 5,000 |
| Completed portion of contract in process; or partial billings on contracts in process | $50,000 |

* * * * * * *

"* * * the debit account, 'Contract in process,' does not by any stretch of the imagination represent an asset of the contractor except as an indication that he has done work and thus has a right to recover money from the obligor—usually a different sum of money. This right to recover money is a receivable and is commonly represented in the balance-sheet as such * * *." (Myron M. Strain, "Some Specialized Phases of Accounting Practice," pp. 4, 5, 6 (The Pacioli Press—1947).)

[5] "* * * this method of progress billings is customary in the construction industry for the purpose of providing a convenient means of financing the costs of contractors. * * *

"* * * This practice has developed over the years as a method by which a contractor can more efficiently and expediently perform his obligations under the contract through the financing by the customer, instead of being required to finance his costs through a bank or outside lending institution." (Petitioner's briefs.)

The parties also agree that "the word 'payment' has a specified and clear meaning which is that a claim has been paid. 'Payment' is clearly distinguishable from loans and advances." (Respondent's brief.) "Petitioner agrees that the word 'payment' has the specified and clear meaning that a claim has been paid, but the claim of Petitioner arose from its right to bill its customer under the terms of the contract, and not from the fact that it had expended specific funds." (Petitioner's reply brief.)

When the work was being done and the expenses incurred were carried in an asset account, the total might or might not, of course, equal or exceed the billing that was authorized by the contract. But it seems to us that at least as soon as a bill was sent to the customer based under the contract on the work already performed, an account receivable was thereby created.[6] This account receivable would presumably also be included in "Notes and Accounts Receivable," an asset account, and would represent in whole or in large part the same asset created by the expenditures for the work done. To some extent, while the bill to the customer remained unpaid, there would thus be a duplication of assets,[7] in order to avoid which, and not to overstate total assets, it would seem to be necessary in some manner to replace as an asset the expenditure item with the billing item upon the creation of the account receivable by the billing.[8] Petitioner insists that "[r]espondent has not shown how any such alleged duplication of assets exists; in fact, it is clearly inferable from the balance sheet of Petitioner at June 30, 1950, that there is no such duplication in assets. The date of June 30, 1950, is the only relevant date." [9] But any absence of duplication on that date would be purely accidental. It would arise from the fact that presumably all billings had then been paid. Otherwise, the progress expenditures must have

---

[6] Petitioner appears to agree that this is so. "The contractor's account receivable from the customer arises only at the date when it is entitled to and does render a billing in accordance with the terms of the contract." (Petitioner's reply brief.)

[7] Petitioner contends that there is no reason for assuming that Congress was unwilling to permit the computation of excess profits credits on duplicating assets. But this would be so inequitable that we are unwilling to accept it as part of the congressional purpose.

[8] It is not clear to what extent petitioner's books actually reflected the elimination of any such duplication. Apparently when the bill was sent, "[t]his was the date on which Petitioner debited accounts receivable on its books and credited a deferred income amount [account ?] styled 'Deferred Income—Job Contracts'. (Stip. par. 11)."

The stipulation already quoted above continues: "* * * Petitioner accumulated [debited ?] all costs with respect to a particular contract in an asset account styled 'Work in Progress' until the job was completed. All amounts billed the customer prior to completion of the contract were credited on the books of Petitioner to a deferred income account styled 'Deferred Income—Job Contracts', and accounts receivable were debited. When payments were received, the accounts receivable were credited and the cash account was debited. Upon completion of the job * * * the charges in the 'Work in Progress' account and the credits in the 'Deferred Income—Job Contracts' account * * * were transferred to profit and loss."

[9] The burden of proof, of course, is not on the respondent but on the petitioner.

been represented in "Notes and Accounts Receivable," as well as in "Advance Costs on Work-in-Progress." If this is correct, only the excess of amounts expended over corresponding billings should remain as a separate asset,[10] and in this case no such asset existed.

Of course, regarding the asset as an account receivable, at least when the billing takes place, and combining it with petitioner's statement that "a payment received from a customer represents a reduction of an account receivable * * * which * * * arose from the *billing*," means that where, as in this case, all of the billings apparently have been paid, no account receivable and therefore no asset remains in that respect either. One could obviously go further and assume that any payments made by a customer would show up in cash on hand. The difficulty, naturally, is that the cash may have been spent, either for some other asset, or in reduction of some liability, in which event the item would not appear as an asset at all.

If we are correct so far, it will be evident that respondent's determination must be sustained. The legislative purpose seems to us to preclude the recognition as an asset of items which tend to be merely duplication of other assets. And there is nothing in petitioner's long-continued method of accounting which indicates the contrary. In fact, until it became advantageous to do so for tax purposes, petitioner apparently did not regard work-in-progress expenditures as an asset at all, at least, when, as appears here, billings had exceeded costs.

Petitioner has conceded the statute of limitations issue originally raised.

*Decision will be entered for the respondent.*

---

[10] See American Institute of Accountants (270 Madison Ave., New York 16, New York) "Long-term Construction-type Contracts," Accounting Research Bulletin (Oct. 1955) No. 45:

"When the completed-contract method is used, an excess of accumulated costs over related billings should be shown in the balance sheet as a current asset, and an excess of accumulated billings over related costs should be shown among the liabilities, in most cases as a current liability. If costs exceed billings on some contracts, and billings exceed costs on others, the contracts should ordinarily be segregated so that the figures on the asset side include only those contracts on which costs exceed billings, and those on the liability side include only those on which billings exceed costs. It is suggested that the asset item be described as 'costs of uncompleted contracts in excess of related billings' rather than as 'inventory' or 'work in process,' and that the item on the liability side be described as 'billings on uncompleted contracts in excess of related costs.' "