STATE EX REL. SUPERIOR SHIP BUILDING COMPANY,
Respondent, vs. BECKLEY, City Clerk, Appellant.

*September 21—November 15, 1921.*

*Taxation: Exemption: Property owned by United States: Vessels
under construction: Materials: Title.*

Under sub. (1), sec. 1038, Stats., providing that property "owned
exclusively by the United States" shall be exempt from taxa-
tion, vessels wholly or partially completed and materials used
in their construction were not taxable where a ship-building
company, engaged to build certain vessels for the United
States Shipping Board Emergency Fleet Corporation under
contracts which provided that title to the vessels at any stage
in construction and of assembled materials should, in so far as
the same were paid for, be in the United States, and where,
also, advances made on the date of assessment exceeded the
amounts wrought into the vessels.

APPEAL from a judgment of the superior court of Doug-
las county: SOLON L. PERRIN, Judge. *Affirmed.*

*Certiorari* to the board of review of the city of Superior.
The personal property of the *Superior Ship Building Com-
pany* at Superior, hereafter, for convenience, called the
*Company,* was assessed for the years 1918 and 1919. In
1920 the *Company* filed objections with the board of review
to the assessed valuation of its plant and property for that
year. Upon December 20, 1920, there was placed upon the
assessment roll of the city of Superior by the board of re-
view the following assessment against the *Company:*

"Personal property omitted in the year 1918, $2,297,000.
Personal property omitted in the year 1919, 2,342,000."

It appears from the record that the property had been in-
tentionally omitted from the assessment rolls for the years
1918 and 1919 by reason of a claim made by the *Company*
that the title to the property was in the United States and
that it was therefore exempt from taxation. The *Company*
is a subsidiary of the American Ship Building Company,
which owns all of the stock of the *Company.* It appears,

without dispute, that on May 1, 1918, there were under construction in the yards of the *Company* seven vessels numbered 531 to 537 inclusive, and on May 1, 1919, there were under construction in the yards of the *Company* at Superior seven vessels numbered 543 to 549 inclusive. There was included under these vessels all of the material assembled in the yard at the time for their construction. All of the vessels were constructed under contract made by the American Ship Building Company with the United States Shipping Board Emergency Fleet Corporation, hereafter referred to, for convenience, as the Fleet Corporation. The contracts, except as to slight differences in equipment, were substantially the same. The contract for the vessels was assumed by the *Company,* and we will hereafter treat the matter as if the contract had been made directly with the *Company.* The *Company* agreed to construct the vessels according to certain plans and specifications and to deliver the vessels, when completed, afloat at its works at Superior, Wisconsin. Payment was to be made, ten per cent. at the time of the signing of the contract and in ten and five per cent. payments as the work progressed. By the terms of the contract the Corporation, as owner, might exercise very large supervisory powers both as to workmanship, design, purchase of materials, and employment of labor. It was further provided that in the event of the failure of a contractor to carry out the provisions of a contract the Corporation might take possession of the premises and complete the work. By paragraph 5 of the contract it was provided:

"It is agreed that the title to said vessel, either completed or under construction, in so far as it shall have been inspected and approved and paid for by the owner, shall be in the United States of America, and that the title for all materials for the furtherance of work under this contract, however and by whomsoever contracted for or assembled or set up in the ship yard or used in the construction of the work under this contract, shall, so far as paid for by the owner, be in the owner at all times."

. It was further agreed that nothing contained in the clause quoted should be construed as a waiver of the right to reject unsatisfactory work or materials, and it was also provided that until the vessel· should be completed and accepted by delivery the vessel should be at the risk of the contractor, and · in case of damage or destruction should be restored or replaced by the contractor (the *Company*) at its own cost and expense.

The *Company* agreed also to "pay all lawful taxes, if any, upon the materials on hand and the vessel under construction, up to the time the vessel shall have been finally accepted by the owner." By its terms time was of the essence of the contract, and a bonus of $300 per day was to be paid for each and every day gained by the *Company* by advancing the delivery. It is further provided that should the contractor become insolvent, make an assignment, or commit any act of bankruptcy, the owner might forthwith take possession of and complete the work without giving notice to the contractor. Upon the signing of the contract the Corporation instructed the *Company* to purchase certain material in certain places from certain supply houses, and orders were accordingly placed pursuant to the instructions of the district manager of the Fleet Corporation. In many instances the material for the vessels was purchased by the Fleet Corporation and shipped to itself. A force of guards was placed in charge of the premises and representatives of the Fleet Corporation had power to discharge any employee of the *Company* at will. These guards were solely under the direction of the officers of the Fleet Corporation. The flag of the Fleet Corporation was raised every morning and lowered every night during the time that the Fleet Corporation was in possession. The material which was ordered was specified for each vessel, inspected at the point where manufactured, and arrived at the premises of the *Company* with the inspector's mark and the particular vessel for which it was designed indicated. The materials ordered and designed to be incorporated in the various vessels were at all times

State ex rel. Superior S. B. Co. v. Beckley, 175 Wis. 272.

under the control of the Fleet Corporation. The rate of wages was that prescribed by the Macy Labor Adjustment Board, and any price paid above a certain scale was to be made a special claim for additional wages by the *Company.* An agent of the Labor Adjustment Board was sent to the yards of the *Company* and instructed the employment managers personally as to their duties. The last vessel was delivered on October 7, 1919. It appears that vessel No. 531 was partially completed and requisitioned by the government, and on May 1, 1918, there had been expended upon her $424,586.51. On the vessels remaining in the yard on May 1, 1918, the following expenses had been incurred and advancements made:

|  | Expended. | Advanced. |
|---|---|---|
| No. 531........:.... | $424,586 51 | $470,750 |
| No. 532........... | 360,819 36 | 468,000 |
| No. 533........... | 320,223 27 | 468,000 |
| No. 534........... | 209,491 44 | 328,500 |
| No. 535........... | 179,964 15 | 182,500 |
| No. 536........... | 120,397 95 | 146,000 |
| No. 537........... | 112,313 12 | 73,000 |
| Total ........ | $1,727,795 80 | $2,136,750 |

The amount advanced in each instance exceeded the amount then wrought into the vessel, including materials on hand designed for the vessel.

On May 1, 1919, there were under construction seven vessels, the total cost of which on that day and the amount advanced appears in the tables below:

|  | Expended. | Advanced. |
|---|---|---|
| No. 543........... | $536,759 29 | $648,000 |
| No. 544........... | 466,594 30 | 656,000 |
| No. 545........... | 460,279 36 | 574,000 |
| No. 546........... | 441,126 16 | 492,000 |
| No. 547........... | 366,228 51 | 410,000 |
| No. 548........... | 281,123 42 | 369,000 |
| No. 549........... | 259,683 78 | 164,000 |
| Total ........... | $2,811,794 82 | $3,313,000 |

It appeared, without dispute, that the materials on hand which had been charged against the respective vessels on the dates in question had been inspected, passed, and accepted by the Fleet Corporation and were ready to be built into the vessels. After the vessels were completed there was a formal trial and a certificate of acceptance was issued by the United States. The date of the acceptance of each of the vessels is shown below:

| | |
|---|---|
| 532, July 2, 1918. | 544, June 25, 1919. |
| 533, July 31, 1918. | 545, June 23, 1919. |
| 534, August 26, 1918. | 546, August 15, 1919. |
| 535, September 30, 1918. | 547, September 12, 1919. |
| 536, October 19, 1918. | 548, September 30, 1919. |
| 537, September 14, 1918. | 549, October 17, 1919. |
| 543, May 2, 1919. | |

It further appears that the bulk of the material was furnished by the United States Steel Corporation and its subsidiaries upon order of the Fleet Corporation.

Upon the trial in the superior court the court was of the opinion that whether the title to the vessels and material was in the Fleet Corporation or in the United States was immaterial; that it was not in the *Company,* and therefore, under the doctrine laid down in *Ashland Co. v. Knight,* 129 Wis. 63, 108 N. W. 208, it was not assessable in 1920 to the *Company.* Judgment was accordingly entered setting aside and vacating the assessment complained of, from which judgment the defendant appeals.

*T. L. McIntosh* and *R. M. Rieser* of Superior, for the appellant.

For the respondent there was a brief by *Hanitch, Hartley, McPherson & Johnson* of Superior, attorneys, and *Kelley & Cottrell* of Cleveland, Ohio, of counsel; and the cause was argued orally by *C. J. Hartley* and *G. W. Cottrell.*

ROSENBERRY, J. Brief of appellant contains no assignment of errors as required by Rule 10, and after a very brief

statement of facts proceeds at once to the argument of a number of abstract questions. Inasmuch as the controlling question in this case is, In whom was the title to the property in question on the respective dates mentioned? we may assume that the contention of the appellant is that the court erred, as a matter of law, in holding that it was not in the *Company*.

It is contended by appellant that under the provisions of sub. (1), sec. 1038, Stats., the property exempt from taxation is "that owned exclusively by the United States or by this state," and that the property in question was not exclusively that of the United States but that the *Company* had some interest therein. When the facts and circumstances which surrounded the parties at the time these contracts were entered into are considered, the purpose of those provisions of the contract which attempt to pass title to the property and vessels under construction is plain. The interest to be served was a public interest in its widest application. The fate of the whole contest in which the world was then engaged depended upon shipping, and every nation engaged in the war was endeavoring by all possible means to construct in the shortest possible space of time vessels to supply their respective needs. The contract shows that the greatest care was exercised on behalf of the Fleet Corporation and the officers representing the government of the United States to retain at all times complete control over vessel-building operations. If it is possible to use language which is plain and definite passing the title to partially constructed vessels and the materials on the premises designed therefor, it must be conceded that the language of the contract in this case does it. Indeed it is very doubtful if under the terms of the contract the title to any considerable part of the materials wrought into these vessels was ever in the *Company*. The materials were bought under specifications prepared and delivered to the companies fabricating the same directly by the government and paid for, and when delivered under the

terms of the contract the title to this material was undoubtedly in the United States. Under the contract, and in fact, the *Company* had surrendered possession of its own property to the United States government and was little more than an agency employed by the government and the Fleet Corporation to do certain work. In the case of *U. S. v. Ansonia B. & C. Co.* 218 U. S. 452, 31 Sup. Ct. 49, a similar question, although under different circumstances, was presented to the court. It was there held:

"It is undoubtedly true that the mere facts that the vessel is to be paid for in instalments as the work progresses, and to be built under the superintendence of a government inspector, who had power to reject or approve the materials, will not of themselves work the transfer of the title of a vessel to be constructed, in advance of its completion. But it is equally well settled that if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title."

The fact that the contract contained other clauses relating to insurance, the duty of the *Company* to restore the property in case of destruction by fire, and the payment of valid taxes, if any, does not operate to modify the clear intent of the parties as expressed in the language of the contract relating to the time when the title shall pass.

By the clause of the contract referred to the title to the vessels passed to and was in the United States exclusively. This applies not only to the vessels wholly or partially completed, but to all materials for the furtherance of the work under the contract. It was therefore by law exempt from taxation.

Many other questions are discussed by counsel which we find it unnecessary to consider in the view which we take of this case. It is undisputed that the material was furnished and the vessels constructed under the contract containing the

clause in question, and the exact relationship of the American Ship Building Company to the *Superior Ship Building Company,* or the exact powers and duties of the Fleet Corporation, are immaterial. Under the terms of the contract as executed, the title to the vessels, wholly or partially completed, as well as the material, passed to the United States.

*By the Court.*—Judgment affirmed.