**ANDERSON BROTHERS CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18711.**

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1961.

Clyde L. Wilson, Jr., Marvin K. Collie, Houston, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Marselli, Attys., Dept. of Justice, Washington, D. C., Hart H. Spiegel, Chief Counsel, I. R. S., Claude R. Marshall, Sp. Atty., I. R. S., Washington, D. C., Benjamin M. Parker, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, and HUTCHESON and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This case involves the application of the Korean War Excess Profits Tax to the appellants here, a "new corporation," whose "excess profits credit" requires a determination of its "total assets" on the critical date, June 30, 1950.

The facts are not in dispute. Appellant, a corporation organized under the laws of Texas on July 1, 1946, had its principal place of business during its fiscal years ended June 30, 1950, 1951 and 1952 in Houston, Texas, and filed its income tax returns for those years with the collector (director) of internal revenue, Austin, Texas.

During the fiscal years ended June 30, 1950, June 30, 1951, and June 30, 1952, Appellant's primary business activity was that of a pipe line contractor. It

maintained its books and filed its United States income and excess profits tax returns for such fiscal years and prior years on the completed contract basis.

In the construction of pipe lines during the fiscal years ended June 30, 1950 and June 30, 1951, and June 30, 1952, the pipe line customers provided the right of way and furnished the pipe. Appellant furnished labor, equipment, and other materials and supplies. The customary contract entered into by Appellant and its customers during these fiscal years provided for a contract price which was based upon specified unit prices for the various phases or classes of work to be performed by the Appellant pursuant to the contract. The customary contract provided further that either monthly or semi-monthly, Appellant would be paid a fixed percentage, usually 80 percent or 90 percent, of the estimated amount payable for work done by Appellant during the preceding period as a partial payment on the total contract price, the remaining 10 percent or 20 percent being payable by the customer after the completion of the contract upon its final acceptance of the work performed by Appellant.

In accounting for pipe line construction contracts in progress during the fiscal years ended June 30, 1950, June 30, 1951 and June 30, 1952, and all prior years, Appellant accumulated all costs with respect to a particular contract in an asset account styled "Work in Progress" until the job was completed. All amounts billed the customer prior to completion of the contract were credited on the books of Appellant to a deferred income account styled "Deferred Income-Job Contracts", and accounts receivable were debited. When payments were received, the accounts receivable were credited and the cash account was debited. Upon completion of the job and acceptance by the customer, the charges in the "Work in Progress" account and the credits in the "Deferred Income-Job Contracts" account with respect to the job were transferred to profit and loss. At the end of the fiscal years ended June 30, 1950, June

30, 1951, and June 30, 1952, the books of Appellant reflected balances in the "Work in Progress" account of $4,289,740.13, $6,778,401.57, and $10,659,490.26, respectively, and balances in the "Deferred Income-Job Contracts" account of $4,903,512.31, and $8,394,242.18 and $12,447,241.16, respectively.

Attached to the return filed by petitioner on October 16, 1950, for the fiscal year beginning July 1, 1949, and ending June 30, 1950, was a comparative consolidated balance sheet.

A comparison of this balance sheet filed by appellant with its return for the fiscal year ended June 30, 1950, with the balance sheet filed with its return for the fiscal year ended June 30, 1951, discloses, in pertinent part, the same total assets at June 30, 1950, save for the following:

(a) In the balance sheet attached to appellant's return for the fiscal year ended June 30, 1951, total assets are shown in the amount of $7,317,856.74, rather than $3,028,116.61 as shown on the balance sheet included with appellant's return for the fiscal year ended June 30, 1950.

(b) This increase in total assets in the amount of $4,289,740.13 is due entirely to the addition of an item entitled "Advance Costs on Work-in-Progress" in like amount.

A comparison of the balance sheets filed by appellant with its returns for the fiscal years ended June 30, 1950 and June 30, 1951, each purporting to show appellant's financial condition at June 30, 1950, discloses identical items and amount on the liabilities and capital side of the respective balance sheets, save for the following:

(a) On the balance sheet attached to appellant's return for the fiscal year ended June 30, 1950, appears an item entitled "Deferred Income From Job Contracts" in the amount of $613,772.18. However, on the balance sheet attached to appellant's return for the fiscal year ended June 30, 1951, the item entitled "Deferred Income From Job Contracts" has

been deleted and a new item, entitled "Reserve for Advancing Billings on Work-in-Progress" has been added in the amount of $4,903,512.31 at June 30, 1950.

(b) The amount of $613,772.18 is the difference between $4,903,512.31, shown as "Reserve Billings on Work-in-Progress," and $4,289,740.31 listed as the amount of "Advance Costs on Work-in-Progress."

A balance sheet filed by appellant with its return for the fiscal year ended June 30, 1950, showing the various assets, liabilities and capital of petitioner at the end of the fiscal year ended June 30, 1949, contains an item entitled "Deferred Income From Job Contracts" but does not contain items entitled "Advance Costs on Work-in-Progress" or "Reserve for Advance Billings on Work-in-Progress."

It is not disputed that whatever assets appellant held on the critical date were held in good faith for purposes of its business.

The parties both state that the question presented is one of first impression. It involves an interpretation of the 1950 Excess Profits Tax Act with respect to the computation of appellant's excess profits credit based upon income. The question arises because as a "new corporation" as defined by Section 445(a) I.R.C.1939, 26 U.S.C.A. Excess Profits

Taxes, § 445(a)[1] the taxpayer was entitled to compute its average base period net income by multiplying the amount of its total assets for the taxable year[2] by the base period rate of return proclaimed by the Secretary for the taxpayer's industry classification.

The parties agree that the only question presented here involves the correct amount of the total assets, i. e., "the sum of cash and property held by the taxpayer," which the appellant is entitled to employ as the multiplicand for purposes of determining its excess profits credit based on income. The question is further narrowed to a dispute as to the effect that is to be given to expenditures which the appellants had made in the partial completion of uncompleted contracts as to which it had received payments from its customers exceeding the amounts of the expenditures. Appellant contends that the total amounts which it had paid out in its performance of the construction contracts, which were then uncompleted, are to be treated as property owned by it notwithstanding the fact that it had received payments from its customers "as partial payments" on the contracts *exceeding the amount of its expenditures*. The Government, on the other hand, takes the position that expenditures made by the taxpayer on uncompleted contracts are an asset or property only so long as they have not been paid back to it.

1. "Average base period net income—new corporation. * * *

"(b) Average base period net income. The average base period net income of a new corporation determined under this section shall be computed as follows:

"(1) For the purpose of determining the excess profits credit for any of the taxpayer's first three taxable years which is a taxable year under this subchapter—

"(A) By multiplying the amount of the total assets for such taxable year (determined under subsection (c)), held by the taxpayer in good faith for the purposes of the business, by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry classification.

"(B) By subtracting from the amount ascertained under subparagraph (A) the total interest paid or incurred by the taxpayer for the 12 months ending with the last day of such taxable year."

2. For the purpose of this litigation it is conceded that the definition of total assets is "the sum of the cash and the property (other than cash, inadmissible assets and loans to members of a controlled group as defined in Section 435(f) (4) [26 U.S.C.A.Excess Profits Taxes, § 435(f) (4)]) held by the taxpayer in good faith for the purpose of business on the last day of the taxpayer's taxable year preceding its first excess profits taxable year." This date would be June 30, 1950 for this taxpayer.

The Tax Court held that expenditures on account of uncompleted contracts constituted property in the hands of the taxpayer only to the extent that the expenditures exceeded payments actually received on account of the same contracts. We conclude that the Tax Court's decision was correct.

The only plausibility that attaches to the taxpayer's contention here arises from its argument that its books of account are kept and its income tax returns are filed on the completed contract basis of accounting [3] and that under such method of accounting it is proper for the taxpayer to accumulate its expenditures under an asset item for bookkeeping purposes and then to accumulate actual payments which are thereafter received as partial payments under the contract in some sort of a reserve account which does not offset the asset item on the books until the contract is finally completed and it has been determined that there has been a profit or loss on the transaction.

Giving every proper deference to the theoretical accounting arguments that are made in support of this proposition, we must conclude that from the point of view of one under a duty to determine what cash or property a taxpayer actually had on June 30, 1950, it is completely fallacious.

Even to a person who is a layman from the accountant's point of view it seems obvious that where a contractor expends substantial sums of money in the partial performance of a construction contract, the items of expenditure are to be considered property, and thus an asset, because, and solely because, they represent an investment by the taxpayer in the finished contract and they are then the basis of a later account receivable, since for every dollar spent in the performance of the contract the owner becomes liable for the payment of a similar or greater amount to the contractor. To such a lay mind it is equally plain that once the partial performance has reached the point where, under the terms of the contract, the contractor-taxpayer is entitled to receive payment, the asset theretofore represented by the expenditure is now, briefly, converted into another type of asset, an account receivable, and, if the parties carry out their contract, shortly thereafter into cash. It would seem that even to pose the proposition that the expenditure item continues to be property even after cash has been received in full payment of the amount of the expenditures is to answer it. No amount of form can overcome the substance, and no amount of theory can overcome the fact, which is that a creditor seeking to seize the property of such a contractor would not be able to reach both and item representing expenditures on uncompleted contracts and the cash sums actually paid by the owner and received of the contractor in repayment of these expenditures.

The fact that for income tax purposes a contractor-taxpayer dealing with long term contracts is permitted to defer the reporting of its profit until it has completed the work has no bearing on the ascertainment of its assets at any point of time prior to the completion of the contract.

We conclude that the Tax Court rightly held that expenditures for uncompleted contracts represented assets only to the extent that they exceeded cash payments received by the taxpayer on account of the same construction jobs for which the expenditures had been made. It being undisputed that the cash received on June 30 exceeded by a substantial amount the taxpayer's expenditures on uncompleted contracts, the Tax Court properly disallowed the item carried on

3. Treasury Regulations having long permitted a taxpayer to compute income from long term contracts on the "completed contract" method of accounting whereby the taxpayer is permitted to wait until the contract is fully completed before income is reported. See Treasury Regulations III, Section 29.42–4 under the Internal Revenue Code of 1939.

the books of the taxpayer as "Reserve for Advance Billings on Work in Progress."

The judgment is

Affirmed.