The BOEING COMPANY, a Delaware
Corporation,

v.

The UNITED STATES.

No. 273–59.

United States Court of Claims.
Nov. 13, 1964.

Andrew M. Williams, Seattle, Wash., for plaintiff. James M. Hilton, Seattle, Wash., of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle, M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM.

This case was referred pursuant to former Rule 45(a) (now Rule 57(a)) to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendations for a conclusion of law. The Commissioner has done so in an opinion and report filed on May 17, 1963. Plaintiff has excepted to the opinion (but not to the findings of fact), the parties have filed briefs, and oral argument has been had. With minor modifications, the court is in agreement with the Commissioner's findings and recommended opinion. Accordingly, the court adopts the findings and opinion, as so modified, as the basis for its judgment in this case, and concludes that plaintiff is not entitled to recover and that the petition be dismissed.

Commissioner Gamer's opinion, as modified by the court, is as follows:

During the years 1946 through 1949, plaintiff had fixed price Government contracts for the production of aircraft under which it received partial payments during the course of performance. The sole question involved in this case is what effect such payments had on the amount of plaintiff's "assets" for the purpose of computing its excess profits tax liability for the year 1951.

By the Excess Profits Tax Act of 1950 (64 Stat. 1137,[1] as amended by Section 510 of the Revenue Act of 1951, 65 Stat. 452), the Internal Revenue Code of 1939 was amended so as to require the payment by corporations of an excess profits tax. (26 U.S.C. (1952 ed.) § 430 et seq.) Plaintiff's excess profits tax under this 1950 act was based on its average net income during a pre-1950 base period. By section 446 of the Code, plaintiff, as a member of a "depressed industry subgroup," was permitted to compute such average base period net income by a formula which was based upon the average of the amounts of its "total assets" computed as of certain base period dates. In plaintiff's case, the dates are December 31 for the years 1946–1949, inclusive.

The parties are in dispute as to the effect that the partial payments made by the Government to plaintiff under its aforementioned 1946–49 contracts had on the amount of plaintiff's "total assets" on said four dates. Under the statute, the higher the average base period net income, the lower would be the excess profits tax.

In the performance of the contracts, plaintiff naturally made expenditures for materials and labor. These expenditures resulted in items of value in the nature of work-in-process inventory. This inventory was justifiably considered as an asset with a value at least equal to the amount of the material and labor expenditures made with respect thereto.

Under the typical contract "Partial Payments" article then in use (set forth in full in finding 4), partial payments were defined as "payments prior to delivery, on work in progress for the Government under this contract." Such payments were permitted to be made "upon property acquired or produced" by the

1. Enacted January 3, 1951, following the outbreak of the Korean War in June 1950, and therefore sometimes referred to as the Korean War Excess Profits Tax Act.

contractor "for the performance of" the contract in an amount which "shall not exceed 90 percent of the cost to the Contractor of the property upon which payment is made." The article then went on to provide that upon the making of any such partial payment "title to all parts, materials, inventories, work in process and non-durable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto * * * shall forthwith vest in the Government." It was also provided that, in making final payment for the aircraft, "there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made."

Prior to the enactment of the Excess Profits Tax Act of 1950, plaintiff, in the calculation of its assets on the balance sheets which it submitted with its Federal tax returns and which it published to its stockholders, regarded such partial payments as effecting a transaction in the nature of a sale to the Government, accompanied by a passage of title, of an equivalent amount of work-in-process inventory. Thus such inventory asset item was reduced by the amount of the partial payment. In turn, the "cash" asset item was increased by the amount of the payment. In this way, the total amount of plaintiff's assets would not be affected by the payment, there being simply an exchange of cash for work-in-process inventory. Plaintiff's excess profits tax return for 1951 was filed on this basis, with its total assets as of December 31, 1946–1949, being so computed. However, on the balance sheet submitted with its return for the calendar year 1950, which was the first return submitted after the passage of the Excess Profits Tax Act of 1950, plaintiff for the first time computed its total assets without its work-in-process inventory being reduced by the partial payments, and plaintiff thereafter followed this practice in the balance sheets submitted with all subsequent returns.

In 1955, plaintiff, contending that in its 1951 return it had erred in treating such partial payments as effecting equivalent sales of work-in-process inventory and had thereby erroneously understated its total assets with respect to each of the years 1946 to 1949, filed a claim for refund of excess profits taxes. Instead, plaintiff argued, these "payments" were, regardless of their form, in substance actually nothing more than loans made by the Government to plaintiff to assist it, by replenishing its working capital, in financing its huge aircraft contract operations, and that the payments should therefore be treated as such for the purpose of the tax. Given such treatment as loans, there would be no sale or passage of title and, consequently, no equivalent reduction of the work-in-process asset item by the amount of the partial payment. Plaintiff's cash item would, however, still be increased by the amount of the "loan." Thus, plaintiff's total assets would naturally be much larger. Indeed, with this new method of treating partial payments, plaintiff's assets which, prior to 1950 had been calculated as amounting to approximately $100 million, soared to approximately $150 million, thus raising the base period average and naturally reducing the amount of its subsequent "excess" profits based thereon. Upon the disallowance of its claim, plaintiff filed its petition here to recover said alleged overpayment of its excess profits tax paid for the year 1951 in the amount of $913,804.64.

In support of its position that the partial payments should be treated as loans and not as payments incident to a sale, plaintiff's principal contention seems to be that the title-passing provision was not intended by the parties to effect such a full transfer of title for actual ownership purposes and that no such ownership transfer was in fact accomplished. Although conceding "that a title of sorts vests in the Government" (Pltf.'s Br., p. 22), and that "in form" the transaction appears as a "payment," plaintiff argues that "in substance" the payments, although not constituting "a conventional loan" (id., pp. 32, 33), amount to nothing.

more than "cash borrowed from the Government" (id., p. 18) and should, for the purposes of this case, be so regarded. It contends, therefore, that at most the Government receives simply a security title to protect its advances of cash made prior to the final delivery and acceptance of the completed aircraft, only at which time is the "sale" effected. This must, of course, be the heart of plaintiff's contention, for if full title and actual ownership to the work-in-process inventory effectively passes to the Government at the time of the partial payment, then obviously plaintiff would not be justified in considering the Government's property as instead plaintiff's property and including it in a listing of plaintiff's assets.

Further, plaintiff points to various other contract provisions, as well as the practices of the parties thereunder, which it claims are inconsistent with the conclusion that the parties intended that complete ownership, incident to a "sale," of any part of the work-in-process inventory shifts to the Government when the partial payment is made. These provisions and practices include those relating to final inspection, delivery, and payment for completed aircraft, with plaintiff becoming entitled to "the contract price" only upon final delivery and acceptance of such aircraft; the lack of inspection as a prerequisite to the making of a partial payment; the provision that the contracting officer "may" make partial payments, thus presenting the "hardly likely" situation of leaving the "agreed purchase price to the discretion of the buyer"; the provisions that title to all work-in-process inventory, no matter how large, acquired either prior or subsequent to the first partial payment passes with the making of such payment, no matter how small, thus allegedly making plain that only a type of security title is involved; the lack of relationship between the amount of any partial payment and the contract unit price of aircraft; the nonsegregation of the Government's "property"; the imposition upon plaintiff of the risk of loss of the property, with plaintiff's actually insuring the inventory for its own benefit on the basis of plaintiff's full investment therein, without diminution on account of partial payments; the disposition rights given to plaintiff during contract performance; and the reversion to plaintiff of title, upon completion of the contract, to all remaining inventory items not incorporated into delivered aircraft, allegedly indicating the real "intention of the parties to buy and sell completed aircraft, and not bits and pieces of inventory." Plaintiff's own intention in this respect is buttressed by its internal books and accounting records—as distinguished from its above-mentioned publicly issued balance sheets—which were kept so as to show the partial payments as a current liability owing to the Government, as would be the case in connection with any loan from a lender, and, similarly, to show, until final delivery of a unit of aircraft was made, its entire investment in the work-in-process inventory, regardless of the source of the funds, as an asset, without reduction to reflect the receipt of partial payments.

Contentions such as these have frequently been advanced over the years in attempts to escape the effect of the title-passing provision of fixed price Government contract partial payment articles similar to or identical with the one herein involved. They have met with little success. At least to the extent of the partial payments, the courts have, in a variety of situations, almost unanimously sustained the provision as effecting a full and complete passage of title or ownership, and as not creating only a lien or security interest. United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910); Shepard Engineering Co. v. United States, 287 F.2d 737 (8th Cir. 1961), reh. den. 289 F.2d 681 (1961); City of Detroit v. Murray Corp., 234 F.2d 380 (6th Cir. 1956), rev'd on other grounds, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958); General Dynamics Corp. v. County of Los Angeles, 51 Cal.2d 59, 330 P.2d 794 (1958); Martin Co. v. State Tax Comm'n of Md., 225 Md. 404, 171 A.2d

479 (1961); In re Read-York, Inc., 152 F.2d 313 (7th Cir. 1945); Douglas Aircraft Co. v. Byram, 57 Cal.App.2d 311, 134 P.2d 15 (1943); State ex rel. Superior Shipbuilding Co. v. Beckley, 175 Wis. 272, 185 N.W. 199 (1921); Consolidated-Hammer Dry Plate & Film Co. v. Commissioner, decided April 25, 1962 (C. C.H. Federal Tax Rep. 1962, Vol. 7, Par. 7469(M)) [reversed, 317 F.2d 829 (C.A. 7, 1963)].

The issue has arisen when the Government contractor has fallen into financial difficulty and, in attempts by its creditors to satisfy their debts out of the contractor's assets, it becomes necessary to ascertain whether certain property in the contractor's possession actually belongs to the contractor or to the Government, Government property, of course, being immune from state materialmen's and mechanics' liens. In the leading Ansonia Brass & Copper Co. case, supra, creditor-suppliers of a shipbuilding company attempted to enforce liens against a partially built vessel which the company was constructing for the Government under a contract calling for the making of partial payments during construction. The contract provided that: "The parts paid for under the system of partial payments * * * shall become thereby the sole property of the United States * * *." There too the contention was made that various other provisions of the contract indicated that the parties actually intended that ownership of the vessel remain in the builder until it was completed and turned over to the Government. However, the Court, after holding that "if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title" (218 U.S. p. 467, 31 S.Ct. p. 52), rejected the contention that any other provisions of the contract, when "read in the light of the purposes of the contracting parties, as gathered from the entire contract," negatived the plain wording of the ownership provision. The contract provisions as to the Government's rights of inspection and rejection upon completion of the vessel, the builder's duty to keep the property insured, and other duties imposed upon it with respect to the property, were not, the Court held, inconsistent with the provision "passing * * * the title in parts as paid for" and did not serve to "cuts down or lessens the binding force of the clear and distinct provisions * * * as to ownership."

"The parties therein dealt with a specific part of the contract, they expressed themselves clearly upon the subject, and it is not to be presumed, in the absence of clear expression or necessary implication, that they intended to supersede this provision in dealing with other specific or general parts of the agreement." (218 U.S. p. 469, 31 S.Ct. p. 53)

Since full title to the uncompleted vessel thus effectively passed to the Government under the partial payment provision, the Court held that the creditors were powerless to levy on the Government's property. However, as to two other vessels being constructed under contracts which did not contain a "stipulation as to passing of the title on partial payments in the progress of the work" (218 U.S. p. 472, 31 S.Ct. p. 54), the Court did sustain the suppliers' liens.

Plaintiff's attempt to distinguish the Ansonia case on the grounds that there the parties clearly contracted "that services or products shall be sold and paid for as the work progresses, and at various stages of performance" (Pltf.'s Br., p. 19) is unconvincing, for the provisions for title passing as an incident to the system of partial payments are substantially similar to those herein involved.

In Shepard Engineering Co. v. United States, supra, a bankrupt prime contractor's work-in-process inventory was covered by a Government contract partial payment title-passing provision which was identical with the provision in the instant case. Its attempted sale of a

part of the inventory to a third party was held to be void since the title to the property had, under the provision, vested in the Government prior to the sale "to the innocent purchaser of the aluminum for value without notice." The court stated: "There is no ambiguity in the words of the contract that the material 'shall forthwith vest in the Government' and there is no reason why the contract should not be enforced by the courts." (287 F.2d at 741.) And further, "that at the time of this purported purchase" the prime contractor "had no title to transfer—under the clear and unambiguous terms of the partial payments clause, title had vested in the United States." (289 F.2d, at 682.)

The Read-York, Inc. case, supra, similarly presented the situation of creditors attempting to reach incomplete gliders being constructed by a bankrupt Government contractor under an Army Air Force contract containing a partial payment title-passing provision. Again the court, after considering the partial payment article and various other contract provisions alleged to be inconsistent with the title-passing provision, held, principally on the authority of Ansonia Brass, that, as to the partial payment article, "[i]t would be difficult to state in more precise terms the conditions upon which title to the property vests in the Government," and, as to the other contract provisions "[w]e find nothing in any other section of the contract inconsistent with" such article. (152 F.2d, at 316.)

Indeed, a title-passing provision standing alone and without being incident to a partial payment provision has been held to be effective as against the creditors of a bankrupt Government contractor. See In re American Boiler Works, 220 F.2d 319 (3d Cir. 1955), where the court held that, with respect to a bankrupt builder of vessels for the Navy, a provision in the contract to the effect that "title to all materials and equipment acquired for each vessel shall vest in the Government upon delivery thereof to the plant of the Contractor or other place of storage selected by the Contractor" was effective "without any mention of payment as a prerequisite thereto." (p. 321.)

Cases involving various types of taxes have arrived at the same result. Most of these are personal property tax cases in which the validity of the assessment was dependent upon ownership of the property since Federal Government property is, of course, immune from direct state or local taxation. United States v. Allegheny County, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944). In the General Dynamics case, supra, county and city ad valorem personal property taxes were assessed against a Government contractor operating under fixed price contracts containing what was therein described as a progress payment clause [2] with a title-passing provision. Although conceding that "[a] title clause standing alone is not conclusive of ownership for tax purposes when it appears that the taxpayer retains the essential indicia of ownership * * * or that the government title is for security only" (330 P.2d, at 798), the court, after reviewing the other allegedly inconsistent contract provisions, including those giving the contractor certain rights to dispose of the inventory, as well as those placing the risk of loss on the contractor, concluded they were "not inconsistent with the government's ownership of the property for tax purposes during the crucial period when title was vested in it." (p. 800.) It pointed out that the contractor's right to dispose of the property was a limited one. This is also true in the instant case, as article 46(d) (finding 4(c)) makes plain. And it further held, relying on the Ansonia Brass case, that "the mere fact that the risk of loss was borne by the contractor is not inconsistent with government ownership." (p. 801.) See, also, Martin Co. v. State Tax Comm'n of Md., supra.

2. The parties here have used the terms "progress payment" and "partial payment" synonymously and interchangeably.

Again in City of Detroit v. Murray Corporation, supra, city and county personal property taxes were held to have been illegally assessed upon property in the possession of an Air Force subcontractor pursuant to a subcontract similarly containing a partial payment title-passing provision which appears to have been identical with the article herein involved, providing, as does the instant article, that upon the making of any partial payment title to the specified inventory and work in process should "forthwith vest in the Government." The court not only rejected the contention that the partial payment and transfer of title clause was invalid, but sustained the holding of the District Court "that under the partial payment clauses title to the property in question was vested in the United States * * * and that this is an *abso-*

*lute* and not a bare lien or security title * * *." (234 F.2d, at 381.)[3] To the same effect is Douglas Aircraft Co. v. Byram, supra, where the court similarly held invalid county and city property taxes levied against partially constructed airplanes and certain materials covered by a Government contract containing a partial payment title-passing provision. Rejecting the contention that "if title did pass to the federal government, it was at most a bare, legal title, for security only, the beneficial title remaining in the" contractor, the court concluded that "[t]he terms of the contract providing that title passes contain no suggestion that it is taken for security only." (134 P.2d, at 17.) [4]

American Motors Corp. v. City of Kenosha, 274 Wis. 315, 80 N.W.2d 363 (1957),[5] is the one case which supports

3. For the thesis that partial payment articles are illegal as violative of Revised Statutes, § 3648 (31 U.S.C. § 529), providing that "no advance of public money shall be made in any case * * *," see McClelland, The Illegality Progress Payments as a Means of Financing Government Contractors, 33 Notre Dame Law. 380 (1958). The history of the series of holdings by the Attorney General and the Comptroller General establishing "that payments under contracts may be made where the United States receives an equivalent benefit therefor in the form of transfer of title to contract materials or work in progress" is set forth in Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham L.Rev. 224 (1957) at 231, et seq. Plaintiff in the instant case does not question the legality of the partial payment article.

4. The court relied heavily on the holding in the similar case of Craig v. Ingalls Shipbuilding Corp., 192 Miss. 254, 5 So.2d 676 (1942). Instead of a fixed price contract with a partial payment clause, the contractor in Craig held a cost-plus contract which did, however, contain a similar provision for passage of title to property "on account of which payments are made." The court there concluded that state, county, and municipal ad valorem tax assessments on such property were invalid.

However where, in the personal property tax cases, it is, in other types of situations, plain that the Government's title is only for security purposes, the property is held to be subject to local taxation. For instance, where the Government as title holder is in the position of a seller (instead of a buyer, as in the instant case), with a balance due on account of the purchase price, it will be recognized that it "retains only a legal title as security" since in such a case it is in substance simply in the position of a mortgagee. S.R.A., Inc. v. Minnesota, 327 U.S. 558, 565, 66 S.Ct. 749, 90 L.Ed. 851 (1946). To the same effect is Offutt Housing Co. v. Sarpy County, 351 U.S. 253, 261, 76 S.Ct. 814, 100 L.Ed. 1151 (1956), where the Government's title was held to be only a "paper title" to secure it for moneys owed on a Wherry Military Housing Act project.

5. Motion to affirm granted *per curiam*, 356 U.S. 21 (1958), 78 S.Ct. 559, 2 L.Ed.2d 578 evidently on the same basis as the Supreme Court's holding in City of Detroit v. Murray Corp., 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958), i. e., that although the state tax was styled a "personal property tax," it was, as actually applied, a tax on the possession and use of property, regardless of ownership. The Court specifically stated (at 492, fn. 2, 78 S.Ct. at 460) that: "For purposes of this case we assume that the United States had full title to the property not just a bare security interest."

plaintiff's contentions. Holding that "[t]he question of ownership for tax purposes is one of local law," the court concluded that a city personal property tax on property ("aircraft engine inventory," consisting of raw materials, supplies, work in process and completed parts) located at the plant of a Government contractor building aircraft engines for the Air Force under a contract containing a partial payment title-passing clause was valid as constituting a tax on the contractor's, and not the Government's, property. After examining the terms of the contract other than the title-passing provision, the court held that although "title" passed to the Government, the contractor was nevertheless "the true owner" of the property.[6] The court held: "In our opinion, the unrestricted right of the Company under the contract to acquire and dispose of the property and the risk of loss are elements of ownership inconsistent with the vesting of such title in the Government as would render the property immune from taxation." (80 N.W.2d, at 367.)

However, as the Court in the General Dynamics Corp. case pointed out, the authority of American Motors Corp. is weakened because of the court's seeming misconstruction of the provisions of the contract concerning the contractor's "unrestricted" right during contract performance to dispose of the inventory. The court in General Dynamics stated: "The decision in the American Motors case, however, appears to have overlooked the fact that the contractor's right to acquire or dispose of the property other than scrap could only be exercised at the option of the government. Until

such option was exercised in favor of the contractor, it * * * had no right to acquire or dispose of government property." (330 P.2d 801.) The identical option language is contained in the article herein involved. And the court went on to criticize the American Motors holding by reiterating "that the mere fact that the risk of loss was borne by the contractor is not inconsistent with government ownership," as was made plain by the Supreme Court's Ansonia Brass holding, which apparently had not been called to the court's attention in the American Motors case, for it fails to even mention it, as it similarly fails to mention its own earlier decision to the contrary in State ex rel. Superior Shipbuilding Co. v. Beckley, supra.[7] In the latter case, the court, relying principally on Ansonia Brass, held invalid state personal property tax assessments against a Government contractor building vessels covered by a partial payment title-passing clause. It stated: "If it is possible to use language which is plain and definite passing the title to partially constructed vessels and the materials on the premises designed therefor, it must be conceded that the language of the contract in this case does it" and that "[t]he fact that the contract contained other clauses relating to insurance, * * * does not operate to modify the clear intent of the parties as expressed in the language of the contract relating to the time when the title shall pass." (185 N. W., at 201.)

And as to income taxes, the Tax Court arrived at the same result in the Consolidated-Hammer Dry Plate & Film Co. case, supra. Since it held that partial

---

6. The court felt constrained to make this distinction between "title" and "ownership" in view of the Supreme Court's holding in United States v. Allegheny County, supra, that: "The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state" and its conclusion in that case

"that title to the property in question is in the United States and is effective for tax purposes." (332 U.S. at 183, 64 S.Ct. at 913–914.)

7. As was noted by Justice Whittaker in his dissenting opinion in City of Detroit v. Murray Corp., supra, 335 U.S. at 524, fn. 9, 78 S.Ct. 458. The dissent was to the Court's construction of the tax as being one on the possession and use of property rather than an ad valorem personal property tax.

payments made pursuant to Air Force contracts upon submission of invoices certifying costs incurred (as in the instant case) were payments received without restriction and resulted in title to the property vesting in the Government on the date of payment, it concluded that such payments were includible in the contractor's income in the year of receipt and not upon the later delivery of the final products. Plaintiff seeks to distinguish this case on the grounds that it is one involving income taxes and the time when taxable income was received, and that it therefore does not involve or require a determination of plaintiff's assets, as does the instant excess profits tax. But the essence of plaintiff's contention in the determination of its assets is "that the partial payments involved in this case are not payments of the contract price for work previously done." (Pltf.'s Br. [to the Commissioner], p. 27.) And this is exactly what the Tax Court held they were, with a resultant passage of title to the Government. Were the partial payments in effect nothing more than loans, as both the taxpayers there and here contend, there would have been no passage of title, the property would therefore have remained in plaintiff's inventory as its assets, and the payments could not have been regarded as income when received.*

On the other hand, where moneys paid under a contract are, as a result of "a careful study of the contract * * * and of the actions of the parties under" the contract, determined to be "advances * * * in the nature of loans," the advances have been held not to constitute income at the time they were made. Summit Coal Co. v. Commissioner, 18 B.T.A. 983, 988 (1930). In the Summit Coal case, the advances were made prior to contract performance and notes were

given to evidence the indebtedness. To the same effect is Veenstra & DeHaan Coal Co., 11 T.C. 964 (1948), where advance deposits by customers to be applied to later deliveries of coal at then prevailing prices were held not to constitute taxable income in the year when the deposits were received.

With the exception of American Motors, all of the above discussed cases in which Government contract partial payment articles with title-passing provisions were involved, as in the instant case, reject practically every contention plaintiff here makes concerning whether a sale occurs and title passes. However, the case of Anderson Brothers Corporation v. Commissioner, 296 F.2d 627 (5th Cir. 1961), is an even stronger holding against plaintiff because it involves the precise assets determination issue under the same 1950 Excess Profits Tax Act as is herein involved in a situation where a partial payment clause contained in a private contract does not appear to have been accompanied by any title-passing provision. Yet the court there too held, in affirming the Tax Court (34 T.C. 199), that the taxpayer, a pipeline contractor receiving such partial payments from its customers on the basis of a percentage of the work done during a preceding period (as is true in the instant case) could not include in its assets both its "Work in Progress" investment and the partial payments received with respect thereto. The taxpayer's "Work in Progress" asset item was, the court held, to be reduced to the extent of the payments. This is, of course, simply another way of saying that the partial payment constituted a true "payment" for the appropriate percentage of inventory work-in-process accomplished theretofore, and to that extent a sale had resulted with a concur-

---

* Since the Commissioner's opinion was filed, the Seventh Circuit has reversed the Tax Court in the Consolidated-Hammer case. 317 F.2d 829, decided May 21, 1963. Insofar as the Court of Appeals viewed the partial payments clause as establishing "a financing arrangement in the nature of a loan," we disagree with its

reasoning. However, that case involved the income tax not the special provisions of the excess profits tax here in issue, and the Seventh Circuit's ultimate conclusion may conceivably be sustainable on the income tax facts it thought it had before it, or on other grounds irrelevant to the present case.

rent passage of title to the property from the contractor to its customers who had paid therefor.

Plaintiff argues that this case too is to be distinguished in that the partial payments were, by the very nature of the subject matter of the contract, in fact true current *pro tanto* payments for completed work, i. e., pipeline laid in place "with no work in process thereafter held by the taxpayer." (Pltf.'s Br. [to the Commissioner], p. 28.) But there is nothing in the opinions of either the Tax Court or the Fifth Circuit to so indicate. The alleged lack of any such work-in-process would be wholly inconsistent with the primary concern of the litigation, i. e., how the partial payments affected the "Work in Progress" asset item. And on this issue, and in clear rejection of plaintiff's contentions here, the Tax Court flatly held that " 'payment' has a specified and clear meaning which is that a claim has been paid. 'Payment' is clearly distinguishable from loans and advances." And the Court of Appeals, in affirming, similarly held that "no amount of theory can overcome the fact, which is that a creditor seeking to seize the property of such a contractor would not be able to reach both the item representing expenditures on uncompleted contracts and the cash sums actually paid by the owner and received on the con-

tractor in repayment of these expenditures." (296 F.2d, at 630.)

Thus, as noted above, a title-passing clause without any accompanying partial payment provision (In re American Boiler Works, supra), as well as a partial payment clause without any accompanying title-passing provision, as in the Anderson Brothers Corporation case, each standing alone, have been held to have effectively transferred ownership in inventory or work-in-process. Certainly, in the instant situation, as shown by the cases hereinabove set forth, where the contract contains both provisions, the ownership transfer is all the more soundly based.[8]

The contention that, because discretion is vested in the contracting officer in that he "may" make the partial payments, the status of such payments as true sale payments is weakened while their status as loans is enhanced, is not persuasive. It could be equally argued that it would be hardly likely that there would be vested in the contracting officer the unlimited discretion as to whether or not "loans" to the extent of millions of dollars should be made to the contractor. United States v. Lennox Metal Mfg. Co., 225 F.2d 302 (2d Cir. 1955).

And as to the further contention relating to the passage of title to greater

---

8. This is not to say that every construction type contract calling for installment payments as the work progresses will automatically be held to effect equivalent concurrent title transfers. The basic problem in each case is to ascertain "the presumed intention of the parties." Clarkson v. Stevens, 106 U.S. 505, 515, 1 S.Ct. 200, 209, 27 L.Ed. 139 (1882). In that case the Court held that despite such payments made under a Navy contract for the construction of a ship, and despite a contract provision that the construction materials should be marked with the letters "U.S." and should become the Government's property, it was not the actual intention of the parties, as shown by other circumstances, that any title should pass to the Government until the ship was completed and delivered. "The courts of this country have not adopted any arbitrary rule of construction as controlling such agreements, but consider the question of intent, open in every case, to be determined upon the terms of the contract, and the circumstances attending the transaction" (p. 515, 1 S.Ct. p. 209). And in Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), where a shipbuilding contract provided for the making of progress payments based on a percentage of the work completed, but without any provision "that ownership of the portion of the work paid for should vest in the United States" (p. 43, 80 S.Ct. p. 1566), the Court held that materialmen's liens on the partially constructed vessels could not be extinguished by a later transfer of title to the Government of the uncompleted vessels. The Ansonia case, with its title-passing provision as a part of the partial payment clause was distinguished.

amounts of property than the actual amounts of the partial payments, any such problem would here appear to be academic since defendant is simply contending that the work-in-process asset item be, for the purpose in question, reduced only to the extent of the partial payments.

The conclusion that the partial payments are here to be considered as true contract sale payments and not loans is not to deny, as plaintiff points out, that in a broad financial or economic sense, partial payments are concededly one way of financing Government contractors and in that respect perform quite the same general function as loans. The Defense Department Regulations specifically so recognize. See Armed Services Procurement Regulations, 32 C.F.R., Part 163, App. E; Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham L.Rev. 224 (1957). "Progress payments are the largest single segment of contract financing in the Department of Defense." Bachman, Defense Department Contract Financing, 25 Geo.Wash.L.Rev. 228, 229 (1956). The other two principal contract financing methods in which the Government participates (as distinguished from purely private financing) are Government guaranteed loans made by private lenders ("V-loans") and advance payments, which precede contract performance. See Bachman, supra. Progress payments are "singularly advantageous" however, because, unlike the other two methods, they do not bear interest nor are they secured. Whelan, supra, at 229. Advance payments are, as plaintiff concedes, true loans. See United States v. Butterworth-Judson Corp., 267 U.S. 387, 45 S.Ct. 338, 69 L.Ed. 672 (1925).

■ And, indeed, for certain purposes, where consideration must be given to how much Government aid a contractor has received as disinguished from private financing, progress payments may be put in the same general category as Government loans. For instance, in determining the reasonableness or excessiveness of profits under the Renegotiation Act, and in applying the guides provided by the act and the regulations for such determination, including such factors as the financial risks undertaken in performing the contract and the amount of Government aid it received, the Tax Court in Boeing Airplane Co. v. Renegotiation Board, 37 T.C. 613 (1962), considered the fact that the contractor "was an inadequately financed and equipped airframe manufacturer" (p. 648), that its "operations were largely financed by the United States through early reimbursement of costs and payments of profit through progress payments and the furnishing of Government-owned manufacturing facilities" (p. 647), and that "we view these payments regardless of their labels as in the nature of loans." (p. 648.) But the fact that for certain general policy purposes partial payments may be considered as a form of contract financing and in the category of loans does not, as the many cases hereinabove analyzed make clear, put them in that category when it is necessary to ascertain the legal relationships they create, including the passage of title, in accordance with specific contract provisions, and the effect such passage has on the amount of a company's assets.

As Justice Whittaker stated in City of Detroit v. Murray Corp., 355 U.S. 489, (p. 517, fn. 4, 78 S.Ct. 458, 465, dissenting opinion, the majority opinion being based on grounds other than those herein involved) in considering the difference between "advance payments" and "partial payments":

"* * * At the time the Act [Armed Services Procurement Act of 1947, c. 65, 62 Stat. 21] was passed the terms 'advance payments' and 'partial payments' had long since become terms of art in government procurement laws and regulations. * * * The two terms are not synonymous. It has long been recognized and understood that an 'advance payment' is a loan by the Government and can be made 'only

upon adequate security' as provided in § 5 of the Armed Services Procurement Act, but 'partial payments' are payments made by the Government in purchase of materials and are authorized when ownership thereto vests in the Government. Army Procurement Regulations (November 18, 1947), §§ 804.400–7, 805.405, 805.407–2(a) (b), 12 Fed. Reg. 7692–7693, 7700, 7704–7705. The distinction is made clear in Armed Services Procurement Regulations of November 23, 1950 (32 CFR (1949 ed.) § 402.501), saying:

"Advance payments shall be deemed to be payments made by the Government to a contractor in the form of loans or advances prior to and in anticipation of complete performance under a contract. *Advance payments are to be distinguished from 'partial payments' and 'progress payments' and other payments made because of performance or part performance of a contract.*"
[Emphasis supplied by Justice Whittaker.]

Plaintiff makes no convincing showing either by legislative history or otherwise that Congress intended that, in the determination of a corporation's assets for the purpose of the Excess Profits Tax Act herein involved, such contract partial payments should not be given the treatment the parties clearly intended by the contract terms and as long interpreted by the courts, and that there was instead some other purpose to be served based upon the broad economic and financial effects of such payments. The contention that the work-in-process inventory was an asset created by plaintiff "regardless of the source of the money expended," and that "plaintiff's assets should be reflected in the full amount of the investment in the performance of the contract * * * until such time as sold" (Pltf.'s Br. [to the Commissioner], pp. 18–19), assumes the very point in question, i. e., the time when the assets were "sold." For certainly, plaintiff's "investment" in the creation of the asset

was reduced when it became reimbursed therefor to the extent of the partial payment.

In the Anderson Brothers Corporation case, supra, the Tax Court, in addressing itself to the congressional intent in enacting the Excess Profits Tax Act herein involved, could find no purpose as would call for disregarding the effect of partial payment clauses. On the other hand, the court held that it would be "inequitable" and violative of the congressional purpose "to permit the computation of excess profits credits on duplicating assets" (34 T.C., at 204), and that "the legislative purpose seems to us to preclude the recognition as an asset of items which tend to be merely duplication of other assets." (34 T.C., at 205.)

Plaintiff contends that Congress, in enacting this act, could not have intended to discriminate between contractors obtaining financing through advance payments, guaranteed loans, or private loans, on the one hand, and partial payments on the other hand, in that the former unquestionably would have their assets increased by the amount of the loan. However, this overlooks the basic fact that in the formula for the computation of the "average base period net income" under section 446(b) (4) and (5) of the 1939 Code, there must be deducted the interest paid or incurred by the taxpayer during the base period (average base period assets $\times$ the industry rate of return — the interest paid during the base period). Thus, those who operate under loans would not necessarily be favored at all, for loans are, of course, ordinarily interest bearing. Indeed, should partial payments be considered as loans for the instant purpose, the favoritism might well be in plaintiff's favor, because this would be a peculiar type of non-interest bearing "loan" and the application of the formula would call for a large increase in the assets part of the formula without any interest reduction whatsoever, whereas other contractors financing their operations through true or conventional loans would be subject to the interest deduction. The Tax Court in the Anderson

Brothers Corporation case noted that the adoption of the taxpayer's contention "means, of course, the elimination of the offset to excess profits credit \* \* \* consisting of interest, which is presumably intended to measure the effect of borrowed capital on petitioner's income." 34 T.C., at 203.[9]

■ The parties here, as did the parties in the Anderson Brothers Corporation, case, supra, presented evidence of accounting practice. However, as the Tax Court stated in Anderson Brothers, the problem is not "primarily one of accounting practice" (34 T.C., at 203). And the Fifth Circuit, in affirming, similarly stated that "[g]iving every proper deference to the theoretical accounting arguments \* \* \* it would seem that even to pose the proposition that the expenditure item continues to be property even after cash has been received in full payment of the amount of the expenditures is to answer it." (296 F.2d, at 630.)[10] As shown, what is determinative is the proper interpretation of the contract as to the effect and the legal consequences of partial payments. True, insofar as such interpretation is dependent upon the intent of the parties, and insofar as the accounting practices that were contemporaneously adopted may throw light upon such intent, such practices may well be relevant. Plaintiff now concedes that this is the only pertinency the accounting aspects have in this case. And in this connection, plaintiff places special emphasis on the accounting procedure relating to the submission of bills following delivery of completed aircraft. Upon such delivery, the practice was for plaintiff to submit a bill to the contracting officer for the full unit contract price. Such officer then forwarded the bill (together with the supporting documents) to the Air Force Finance Officer, who then applied against the bill the

9. Of course, if, as plaintiff points out, plaintiff's industry engages primarily in Government business and finances such business substantially through partial payments, there would be little, if any, discrimination in plaintiff's favor as against other members of the industry group.

Similarly, it may well be that the industry has in a sense been otherwise prejudiced under the act by the nonpayment of interest on partial payments so that the benefit resulting from the lack of an interest deduction in computing the average base period net income would only be in essence somewhat of a compensating factor. Such prejudice would come about as a result of the statutory formula for calculating the industry rate of return. Under section 446(d) (1) (2) such rate of return is determined by adding the interest paid by the corporations in the industry during the prescribed base period to their net income for such period, and then dividing such total by their aggregate assets. Thus, the lower the interest payments by the industry, the lower the industry's rate of return. And correspondingly, the lower the rate of return, the lower would be plaintiff's average base period net income.

However, in their application to the situation of any individual industry member, these considerations would appear to border too much on speculation. In any event they would be more appropriately addressed to the Congress which could, of course, specifically legislate on the matter, as it did, for instance, when it included, in section 439(b) (1), indebtedness evidenced by conditional sales contracts within the definition of "borrowed capital."

10. Where a contractor's books are kept on the completed contract basis of accounting, the contractor is permitted to wait until the contract is fully completed before income is reported. Accordingly, as appeared in the Anderson Brothers Corporation case, it would be proper for such a contractor for such purpose, "to accumulate its expenditures under an asset item for bookkeeping purposes and then to accumulate actual payments which are thereafter received as partial payments under the contract in some sort of a reserve account which does not offset the asset item on the books until the contract is finally completed and it has been determined that there has been a profit or loss on the transaction." (296 F.2d at 630.) The court went on to hold, however, that such accounting practice for that particular purpose would not be determinative of the question of "what cash or property a taxpayer actually had on" a certain date and that to apply it for such purpose would be "completely fallacious." (*id.*)

amount of the partial payments previously made. Plaintiff concludes that this practice of billing for the full unit price of the aircraft at the time of the delivery of the completed aircraft evidences the fact that the parties intended that no sale was made until such delivery was effected.

Plaintiff infers too much from this billing procedure. As a matter of mechanics, it seems plain that there would be little difference between giving credit for the prior partial payments as part of the bill, and merely billing for the balance due, or, as was the adopted procedure, preparing the bill in the full amount of the unit price and then applying the partial payments against the billing. Either procedure would appear to be consistent with the partial payments being considered as either true contract payments or as loans.

██ Equally unconvincing is plaintiff's further contention that because the partial payments were measured by and restricted to a percentage of plaintiff's expenditures, without any allowance for profit, they therefore cannot be considered as true sale payments since it would mean that plaintiff would be indulging in the hardly likely operation of making current sales at a loss. Since the payments are, by their very nature and designation, only "partial" payments, the formula applied to determine their amounts would hardly be of substantial significance on the question of their true nature. If the practices and mechanics adopted in connection with the making of the partial payments is of significance, it could equally be pointed out that the partial payments were made pursuant to "bills" or "invoices" prepared and submitted by plaintiff—terminology customarily applied in the business world to "sales."

On this question of intent and how plaintiff regarded the partial payments, of far greater significance is the fact that plaintiff, prior to the 1950 act in question, on its public balance sheets as well as those submitted with its tax returns, did regard partial payments as effecting equivalent sales of work-in-process inventory, reducing such asset item by the amounts of the payments. As was true in the Anderson case, it seems quite clear that plaintiff changed its "long-continued method of accounting" only when "it became advantageous to do so for tax purposes." (34 T.C., at 205.)[11]

11. However, on the intent issue, it is true, as hereinabove noted, that, as distinguished from its balance sheets, plaintiff has consistently treated partial payments in its internal accounts as advances of working capital and classified them as current liabilities. The testimony of its expert accounting witness was to the effect that this was a permissible method. However, his testimony was that treating the partial payments as offsets to the work-in-process inventory asset item would also be proper.

The conclusion that accounting practices are not determinative of the particular problem here in issue does not result from any lack of accounting authority to support the legal conclusion hereinabove arrived at. Plaintiff's former method of preparing its balance sheets were certified by independent accountants as being "in accordance with accepted principles of accounting" (finding 16(a)). Practically all the other aircraft companies, both before and after the passage of the act, prepare their balance sheets on that basis. Also, the American Institute of Accountants, "long a source of thoughtful guidance to the accounting profession and of increasing importance to lawyers" (Herwitz, Accounting for Long-Term Construction Contracts: A Lawyer's Approach, 70 Harv.L.Rev. 449, 450 (1957)), in its Accounting Research Bulletin No. 45, pertaining to "Long-term Construction-type Contracts," provides, with respect to the two accounting methods commonly followed by contractors, the "percentage of completion method" and the "completed contract method," that, as to the former, "current assets may include costs * * * not yet billed" (par. 5) and as to the latter, only "an excess of accumulated costs over related billings should be shown in the balance sheet as a current asset" (par. 12). As to terminology, it suggests "that the asset item be described as 'costs of uncompleted contracts in excess of related billings'

rather than as 'inventory' or 'work in process' * * *" (par. 12).

Herwitz's rather strong criticism of this bulletin does not relate to the problem involved in the instant case.

Plaintiff's contention that this bulletin is inapplicable in that it refers only to construction contracts rather than the type of contract herein involved seems unwarranted. The bulletin refers to

"Construction-type Contracts," and a long-term contract for the building of airplanes would seem to fall in this category. The bulletin specifically provides that it "would also be applicable in appropriate cases to the manufacturing or building of special items on a contract basis in a contractor's own plant" (par. 1).